## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **CAPITOL SPECIALTY INSURANCE CORPORATION,** | ) ) ) | **CIVIL ACTION** |
| **Plaintiff,** | ) ) | **NO. 4:14-CV-40086-TSH** |
| **v.** | ) ) ) |  |
| **KAILEE HIGGINS, individually and as assignee of PJD ENTERTAINMENT OF WORCESTER, INC., D/B/A CENTERFOLDS II,** | ) ) ) ) |  |
| **Defendant.** | ) ) ) |  |

## MEMORANDUM AND ORDER ON
## PLAINTIFF'S MOTION TO DISMISS (Docket No. 78)
## DEFENDANT'S MOTION TO STRIKE (Docket No. 87)
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Docket No. 88)
## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT (Docket No. 91)
## DEFENDANT'S MOTION TO VACATE (Docket No. 93)
## PLAINTIFF'S MOTION TO STRIKE (Docket No. 109)

### August 26, 2016

**HILLMAN, D.J.**

Capitol Specialty Insurance Corporation (Capitol) moves to dismiss nine counterclaims brought by Kailee Higgins on behalf of herself and PJD Entertainment of Worcester, Inc., d/b/a Centerfolds II (PJD) in this protracted insurance coverage dispute. The counterclaims relate to Capitol's handling of Higgins's tort claims against PJD, which she brought in an effort to recoup damages for serious injuries that she suffered in a motor vehicle accident after leaving PJD's establishment. Although Capitol ultimately paid Higgins the remaining limits under PJD's liquor liability insurance policy, Higgins alleges that Capitol engaged in unfair settlement practices while handling her claim, and that she incurred damages as a result.

1

The parties filed a slew of motions relating to Higgins's counterclaims, which are the only claims that remain in this suit.  Higgins also seeks to vacate my order on a previous summary judgment decision, which I issued in September of 2015.  For the reasons set forth below, Capitol's motion to dismiss (Docket No. 78) and Higgins's motion to strike (Docket No. 87) are ***denied*** as moot.  Capitol's motion for summary judgment (Docket No. 88) is ***denied*** as to counts III, IV, and V, and ***granted*** as to counts I, II, VI, VII, VIII, and IX.  Higgins's cross-motion for summary judgment (Docket No. 91) and Capitol's motion to strike (Docket No. 109) are ***denied***.  Higgins's motion to vacate (Docket No. 93) is ***denied***.

## Background

During the early morning hours of November 28, 2010, Higgins was severely injured in a car accident.  The accident occurred after she left her shift as a dancer at Centerfolds II, an adult club owned and operated by PJD.  She alleges that she was served and permitted to consume alcohol during her shift and that she was intoxicated at the time of the accident.  She was twenty years old at the time.

PJD was insured under a liability policy issued by Capitol, which included two different coverage forms: a Commercial General Liability Coverage Form (CGL Form) with a limit of $1,000,000; and a Liquor Liability Coverage Form (LL Form) with a limit of $300,000.  The CGL Form was subject to a liquor liability exclusion, which eliminated coverage for:

> "Bodily injury" or "property damage" for which any insured may be held liable by reason of:
> (1) Causing or contributing to the Intoxication of any person;
> (2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or
> (3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

2

(Docket No. 90-10 at 50.)

PJD promptly notified Capitol of Higgins's accident, and Capitol retained Norfield Associate, Inc. (Norfield) to conduct a limited investigation of the potential claim. PJD's insurance policy was an "eroding limits" policy, meaning that Capitol bore the costs of claims investigations that occurred before a suit was filed against the insured, whereas the costs of investigation and defense incurred after the filing of a lawsuit would be deducted from the limits of the policy. As part of its limited investigation, Norfield sought information from the Worcester Police Department and the Licensing Commission. Norfield also interviewed Richard McCabe, who was a manager at Centerfolds and a part-owner of PJD.

On December 28, 2010, Norfield provided Capitol with a written summary of its investigation, including the following information provided by McCabe:

> The insured [McCabe] notes that following the incident all workers were interviewed by both the insured and the Worcester Police Department and they universally asserted that Ms. Higgins had not consumed any alcoholic beverages during the evening in question. More specifically, the insured noted that they have the same detail officer, "Dave," working every Saturday evening and he did not recollect seeing Ms. Higgins consume any alcoholic beverages on the evening in question.

(Docket No. 90-4 at 3.) Under a section of the report titled "remarks," Norfield listed future investigatory actions that it would take, including interviewing McCabe and the bartender on duty, developing a list of potential witnesses, mapping out potential routes taken by Higgins, and continuing contact with the Worcester Police Department. However, upon receipt of Norfield's report, Capitol's Senior Claims Specialist, Michael Wedwick, determined that the information obtained to date was sufficient. Norfield issued a final report dated January 25, 2011, confirming a telephone call with Wedwick on January 11, 2011, during which Wedwick had instructed Norfield to close its investigatory file.

3

Nearly one year later, on February 3, 2012, Higgins's then-counsel sent a letter of representation to PJD, stating that Higgins would seek damages as a result of the accident. Higgins's counsel described PJD's purported liability as follows:

> While at Centerfolds, Ms. Higgins was served and permitted to consume alcohol to the point where she became intoxicated. During the early morning hours of November 28, 2010, Ms. Higgins was assisted to her vehicle by the agents, servants, or employees of Centerfolds after which she drove off. The alcohol served to Ms. Higgins at Centerfolds caused her to be impaired, and this impairment caused her to be involved in a serious motor vehicle accident shortly after leaving the parking lot of Centerfolds.

(Docket No. 90-6 at 1.)  Higgins's counsel further alleged that PJD was aware that Higgins was underage.  PJD forwarded this letter to Capitol.  Wedwick construed the letter as presenting a liquor liability claim premised on the service of alcohol by PJD.   He responded to Higgins's counsel by letter on February 13, 2012, denying PJD's liability:

> We respectfully deny any and all liability on the part of our insured for your client's injuries.  Our insured denies that they served alcohol to your under aged client and they are not responsible for the injuries sustained by your client when she was involved in a motor vehicle accident.

(Docket No. 90-7 at 1.)

Within weeks after PJD received Higgins's letter of representation, PJD also advised Capitol of an affidavit of Christine Zbikowski, who was employed by PJD as an entertainer. Zbikowski stated that she had been contacted by Higgins's attorney, and that both Higgins and her attorney had told her that she would be given $10,000 if she signed an affidavit stating that the staff at Centerfolds had served Higgins alcohol while knowing that she was underage and intoxicated.  Zbikowski informed Higgins's counsel that she had not seen Higgins drinking or being served alcohol.  Zbikowski then completed an affidavit for PJD.

4

On February 22, 2013, Higgins filed suit against PJD in Worcester Superior Court, seeking damages relating to her injuries from the accident.  Higgins alleged in her complaint that the staff at PJD had served her to the point of intoxication; that she was obviously intoxicated; that an employee escorted her to her vehicle; and that she drove away and was involved in an accident as a result of her intoxication.  Her complaint included two causes of action: negligence and gross negligence.  The complaint was accompanied by an affidavit, in which she stated that she was intoxicated when she got into her car on the night of the accident.

Capitol interpreted the allegations in Higgins's complaint as asserting a liquor liability claim triggering coverage under the LL Form.  On May 28, 2013, Capitol advised PJD that it had retained counsel to defend it "in the liquor liability claim" filed by Higgins. (Docket No. 90-12 at 1.)  This letter further advised PJD that the applicable policy included $300,000 in liquor liability coverage.  On May 24, 2013, Capitol retained attorney Jeffrey Stern to defend PJD.  In the email assigning the defense of PJD to Stern, Wedwick wrote: "Please accept this assignment to defend our insured, only, in the liquor liability suit filed against them in the Worcester Superior court." (Docket No. 90-11 at 1.)

Stern conducted an investigation and provided multiple reports to Capitol in 2013.  During his investigation, he obtained a copy of the District Attorney's report, which indicated that Higgins had used cocaine and marijuana within twenty-four hours of the accident.  The District Attorney's report also included witness statements from PJD's employees, each of whom had said that they had not witnessed Higgins drinking alcohol on the night of the accident.  In Stern's final report to Capitol, he predicted that PJD's liability "could be as high as $2-3,000,000," and that the likely verdict range based on the information gathered to date was at least $500,000-$1,000,000. (Docket No. 91-26 at 3.)  He noted that "[t]here clearly would be some element of comparative fault here,"

based on the facts that Higgins was intoxicated; that her blood had tested positive for marijuana; and that, according to Zbikowski, Higgins and her attorney had offered to bribe a witness. (Docket No. 91-26 at 3.)   Stern recommended waiting until after Higgins's deposition to offer her a settlement.

Higgins was deposed on December 9, 2013.   Immediately after the deposition, Stern advised Capitol to tender the policy limit available under the LL Form because, in his opinion, it was more likely than not that a jury would believe Higgins's testimony that she had been drinking at Centerfolds before the accident.   Although Stern advised Capitol that Higgins appeared credible in her deposition, he later testified that he did not consider PJD's liability to be "reasonably clear" as that term is defined in Mass. Gen. Laws ch. 176D, § 3(9).   He explained during his deposition:

> The evidence of a bribe, if believed, and I would see no reason to think that this witness made that up, is the sort of evidence that could absolutely be so toxic as to completely undercut a plaintiff's case. . . . [T]he nature of the comparative negligence is not of the momentary-lapse-of-judgment variety but of a protracted series of misjudgments. . . . And, [ ] still a lot of factual disputes, some of which we never, you know, which we never got to evaluate, never talked about, a bunch of witnesses; if the case had gone forward, there would have been, you know, interviews of other waitresses and so forth.

(Docket No. 90-13 at 126.)

After receiving Stern's recommendation, Wedwick shared the information with his supervisor, who authorized Stern to tender the remaining limits available under the LL Form after deducting the costs of any unbilled expenses.   On December 10, 2013, Stern had a phone conversation with Higgins's counsel, in which he stated that Capitol was offering the remaining limits of the LL Form—approximately $285,000—in exchange for a release of all claims against PJD.

6

On December 27, 2013, Higgins's counsel wrote to Wedwick and demanded payment of $1,300,000—the combined total of the CGL Form and the LL Form.   Higgins's counsel acknowledged that Stern "ha[d] communicated to our office that the limit of the Liquor Liability coverage ($300,000) would be offered by [Capitol], but the General Liability coverage ($1,000,000) was being disputed." (Docket No. 90-19 at 4.)   By letter dated February 10, 2014, Capitol responded to Higgins's demand by advising both PJD and Higgins's attorney that the CGL Form did not apply to the underlying loss because of the liquor liability exclusion.

On June 23, 2014, Capitol initiated this lawsuit, seeking a declaratory judgment regarding coverage under the CGL Form.   Specifically, Capitol sought a determination as to whether the CGL Form applied to Higgins's claim and, if so, whether a non-pyramiding clause precluded coverage under both the CGL Form and the LL Form.   In her answer to Capitol's complaint, Higgins asserted counterclaims for violations of Mass. Gen. Laws ch. 93A and ch. 176D, and breach of the contractual duty of good faith and fair dealing.   These counterclaims are the subject of the pending cross-motions for summary judgment.

On March 10, 2015, Capitol moved for summary judgment on its claim for declaratory judgment.   Higgins filed a cross-motion on April 3, 2015.   On July 2, 2015, Higgins and PJD entered into a settlement agreement and an assignment of rights in the underlying state court litigation.   The parties agreed that judgment would enter in favor of Higgins in the amount of $7,500,000.   Higgins agreed to hold PJD harmless for all but $50,000 of the judgment, and PJD assigned its rights against Capitol to Higgins.

On September 1, 2015, I issued an order granting Capitol's motion for summary judgment and denying Higgins's cross-motion on the declaratory judgment claim, finding that the liquor liability exclusion precluded coverage under the CGL Form.   Higgins moved for reconsideration

7

on September 29, 2015, and I denied the motion shortly thereafter.  On October 16, 2015, Capitol

paid Higgins $267,170.88, which was the remaining policy proceeds available under the LL Form

after deducting the costs of investigation and defense.

On May 6, 2016, the parties cross-moved for summary judgment on Higgins's

counterclaims.[1]  (Docket Nos. 88 and 91.)  On the same day, Higgins also moved to vacate my

September 1, 2015 summary judgment order. (Docket No. 93.)

### 1. *Cross-Motions for Summary Judgment on Higgins's Counterclaims (Docket No. 88 and Docket No. 91)*

*Standard of Review*

Rule 56 of the Federal Rules of Civil Procedure provides that the court shall grant summary

judgment if the moving party shows, based on the materials in the record, "that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A factual

dispute precludes summary judgment if it is both "genuine" and "material." *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247-48, (1986).  An issue is "genuine" when the evidence is such that

a reasonable factfinder could resolve the point in favor of the nonmoving party. *Morris v. Gov't

Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994).  A fact is "material" when it might

affect the outcome of the suit under the applicable law. *Id.*

The moving party is responsible for "identifying those portions [of the record] which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

---

[1] Capitol moved to dismiss these claims on March 29, 2016.  This Court had not yet issued a
decision when the parties moved for summary judgment.  Due to the age of this case and the
significant discovery that has occurred, I shall address the counterclaims in the context of the
parties' summary judgment motions rather than Capitol's motion to dismiss.  Accordingly,
Capitol's motion to dismiss (Docket No. 78) and Higgins's motion to strike (Docket No. 87) will
be denied as moot.  Capitol also moves to strike Higgins's reply to its motion for summary
judgment on the basis that Higgins failed to seek leave of court.  The reply is permissible pursuant
to Local Rule 56.1.  Capitol's motion to strike (Docket No. 109) will be denied.

477 U.S. 317, 323 (1986).  It can meet its burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) *aff'd*, 442 F.3d 7 (1st Cir. 2006) (quoting *Celotex*, 477 U.S. at 325).  Once the moving party shows the absence of any disputed material fact, the burden shifts to the non-moving party to place at least one material fact into dispute. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002) (citation omitted). If presented with cross-motions for summary judgment, the court "must consider each motion separately," applying the same standard to each motion. *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir. 1997).

## *Discussion*

Chapter 93A prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a).  Chapter 176D defines unfair methods of competition and unfair or deceptive acts or practices within the business of insurance. Mass. Gen. Laws ch. 176D, § 3.  Chapter 93A provides a private cause of action for individuals who have been aggrieved by an insurance company's unfair claim settlement practices in violation of Chapter 176D, § 3(9). *See* Mass. Gen. Laws ch. 93A, § 9(1); *Bingham v. Supervalu, Inc.*, 806 F.3d 5, 8 n.2 (1st Cir. 2015).

"Chapter 176D was 'enacted to encourage settlement of insurance claims . . . and [to] discourage insurers from forcing claimants into unnecessary litigation to obtain relief.'" *Bingham*, 806 F.3d at 9 (quoting *Hopkins v. Liberty Mut. Ins. Co.,* 750 N.E.2d 943, 952 (Mass. 2001))

(citation omitted).  "One obvious legislative concern was that entities that profit from selling insurance policies not abuse exclusive rights and duties to control litigation vested through those same policies." *Id.* (quoting *Morrison v. Toys "R" Us, Inc.,* 806 N.E.2d 388, 390 (Mass. 2004)). Chapter 176D, § 3(9) lists fourteen specific acts or omissions that constitute unfair claim settlement practices.

Higgins alleges that Capitol committed eight counts of unfair settlement practices: (1) misrepresentation of the benefits and provisions the insurance policy and the pertinent facts of the underlying claim, in violation of Chapter 176D, § 3(9)(a); (2) failure to acknowledge and act reasonably promptly upon communications with respect to claims arising under the insurance policy, in violation of Chapter 176D, § 3(9)(b); (3) failure to adopt and implement reasonable standards for the prompt investigation of claims arising under the policy, in violation of Chapter 176D, § 3(9)(c); (4) willful and knowing refusal to pay Higgins's claims without conducting a reasonable investigation based upon all available information, in violation of Chapter 176D, § 3(9)(d); (5) willful and knowing failure to effectuate prompt, fair, and equitable settlement of Higgins's claims for which liability became reasonably clear, in violation of Chapter 176D, § 3(9)(f); (6) willful and knowing compulsion of Higgins and PJD to institute litigation to recover amounts due under the insurance policy by offering substantially less than the amounts ultimately recovered by Higgins in her settlement with PJD, in violation of Chapter 176D, § 3(9)(g); (7) willful and knowing failure to settle Higgins's claims where liability had become reasonably clear under one portion of the insurance policy in order to influence and avoid settlement under other portions of the insurance policy, in violation of Chapter 176D, § 3(9)(m); and (8) willful and knowing failure to provide a prompt and reasonable explanation for the basis of the denial of

Higgins's claims, in violation of Chapter 176D, § 3(9)(n).  Higgins also asserts a claim for breach of the common-law duty of good faith and fair dealing.

Much of the factual allegations set forth in Higgins's counterclaims center on Capitol's failure to provide coverage under the CGL Form.  She asserts that she had two separate claims against PJD: negligent service of alcohol to a minor, and negligent escorting of an intoxicated person to a vehicle—the latter being independent of the service of alcohol and thus not subject to the liquor liability exclusion in the CGL Form.  I addressed the applicability of the liquor liability exclusion in the context of Capitol's motion for summary judgment on its claim for declaratory judgment and found that the negligent escorting claim could not be conceptually severed from the negligent service of alcohol.  I found that the liquor liability exclusion applied to all of Higgins's claims, meaning that coverage was not available under the CGL Form.  Accordingly, Capitol is now entitled to judgment as a matter of law on counts I and VII of Higgins's counterclaims, because these claims rely on Capitol's failure to provide coverage under the CGL Form.[2]  I will discuss below the remainder of the counterclaims, which relate to Capitol's settlement of the claim under the LL Form.

---

[2] In count I, Higgins alleges that Capitol violated Chapter 176D, § 3(9)(a) by willfully and knowingly misrepresenting the benefits and provisions of its insurance policy and the pertinent facts of the underlying claim.  This claim refers to the allegation that Capitol intentionally misconstrued Higgins's claim in an effort to avoid negligent escort liability under the CGL Form. Capitol is entitled to judgment on this count because there was no coverage under the CGL Form. In count VII, Higgins alleges that Capitol violated Chapter 176D, § 3(9)(m) by willfully and knowingly failing to promptly settle Higgins's claims, where liability was reasonably clear under one portion of the insurance policy, in order to influence and avoid settlement under other portions of the insurance policy.  Capitol is entitled to judgment on this claim because only one coverage form—the LL Form—applied to Higgins's claims.

_Count II: Chapter 176D, § 3(9)(b)—Prompt Response to Communications_

Higgins alleges that Capitol violated Chapter 176D, § 3(9)(b) by failing to acknowledge and act reasonably promptly upon communications with respect to the claims arising under the insurance policy.   Higgins argues that Capitol failed to reasonably respond to her letter of representation dated February 3, 2012 and her demand letter dated December 27, 2013.   Capitol did, however, respond to these letters.   Wedwick responded to the letter of representation on February 13, 2012, explaining that Capitol was denying liability because PJD had denied that its staff had served alcohol to Higgins.   Capitol responded to the December 27, 2013 demand letter on February 10, 2014, advising both PJD and Higgins's attorney that the CGL Form did not apply to the underlying loss because of the liquor liability exclusion.   Higgins does not dispute that Capitol acknowledged and responded to her communications in a timely manner.   Rather, she takes issue with the positions that Capitol took with regard to liability, as expressed in these responses. Thus, her complaints do not fall under the purview of section 3(9)(b) but may be addressed under different subsections of section 3(9), as discussed below.   Capitol is entitled to judgment on count II.

_Count III: Chapter 176D, § 3(9)(c)—Reasonable Standards for Investigations_

Higgins alleges that Capitol violated Chapter 176D, § 3(9)(c) by failing to adopt and implement reasonable standards for the prompt investigation of claims arising under the insurance policy.  Higgins relies on the testimony of Mary Haefer, Capitol's Claims Manager, who testified that Capitol did not have any specific standards in place that were intended to satisfy Chapter 176D's requirements for the prompt investigation of claims.   Wedwick, testifying as Capitol's representative, stated that he had never heard of Chapter 93A before he began handling Higgins's claim; that he was not familiar with Chapter 176D; that Capitol did not provide any training on

Chapters 93A or 176D before or during the handling of Higgins's claim; and that the first time Capitol learned of Chapter 93A was from Higgins's counsel.  According to Higgins, Capitol's lack of standards and knowledge of Massachusetts law resulted in the delayed payment of her claim.

Capitol, for its part, asserts that it provided its claims personnel with Best Practices Manuals that set forth claims handling procedures and practices designed to comply with all states' statutory and common-law claims handling requirements.  Capitol further argues that, because it ultimately paid Higgins the remaining limits of the LL Form, its actions could not be considered unreasonable.

Higgins has not provided any specific reasons why Capitol's claims manuals are deficient under Chapter 176D, nor has she cited to any case law suggesting that an insurance company violates Chapter 176D by failing to have standards that specifically reference the statute. Nevertheless, as explained *infra*, a reasonable fact-finder could conclude that Capitol did not comply with the mandates of Chapter 176D in handling Higgins's claim.  Construing the record in the light most favorable to Higgins, a reasonable fact-finder could further conclude that this failure stemmed from Capitol's lack of state-specific training or knowledge.  Accordingly, neither party is entitled to summary judgment on count III.

### *Count IV: Chapter 176D, § 3(9)(d)—Refusal to Pay Claims without Reasonable Investigation*

Higgins alleges that Capitol violated Chapter 176D, § 3(9)(d) by willfully and knowingly refusing to pay her claims without conducting a reasonable investigation based upon all available information.  The investigation at issue is the limited Norfield investigation, which formed the basis for Capitol's initial denial of Higgins's claim in early 2012.

"[R]ecovery on a theory of inadequate investigation is limited to circumstances where, if an adequate investigation had been conducted, liability would have been reasonably clear." *Spinal*

*Imaging, Inc. v. Aetna Health Mgmt. LLC*, No. CIV. 09-11873-LTS, 2014 WL 4202498, at *14 (D. Mass. Aug. 21, 2014) (citing *Behn v. Legion Ins. Co.,* 173 F. Supp. 2d 105, 113 (D. Mass. 2001)).  "Among other possible ways, an insurer violates [section 3(9)(d)] by purposefully and strategically failing to pursue a line of inquiry because it would uncover unfavorable evidence." *Bohn v. Vermont Mut. Ins., Co.*, 922 F. Supp. 2d 138, 149 (D. Mass. 2013).

"In order to determine whether liability is 'reasonably clear,' the fact finder must determine 'whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff.'" *Nyer v. Winterthur Int'l*, 290 F.3d 456, 461 (1st Cir. 2002) (quoting *Demeo v. State Farm Mut. Auto. Ins. Co.,* 649 N.E.2d 803, 804 (Mass. App. Ct. 1995)).  Relevant facts include "insurance industry practices in similar circumstances, expert testimony that the insurer violated sound claims practices, the defendant's own evaluation of the plaintiff's claim, and advice given to the insurance company on the probability of success at trial." *O'Leary-Alison v. Metropolitan Property & Cas. Ins. Co.,* 752 N.E.2d 795, 798 n.3 (Mass. App. Ct. 2001).  Liability is not reasonably clear if the percentage of damages attributable to the defendant is contested in good faith. *See Bobick v. U.S. Fid. & Guar. Co.*, 790 N.E.2d 653, 659 (Mass. 2003); *see also Ingalls v. Minnesota Lawyers Mut. Ins. Co.*, No. CIV.A. 12-11057-GAO, 2013 WL 3943537, at *1 (D. Mass. July 29, 2013).

Capitol argues that it is entitled to judgment on this count because liability was never reasonably clear, even after Stern's investigation.  In support, Capitol notes that no witnesses corroborating Higgins's version of events were ever identified; all witnesses that did provide statements denied seeing her drink alcohol or showing signs of intoxication; and there was undisputed evidence of contributory fault.

14

Higgins makes several related arguments to support her claim that the Norfield investigation was inadequate. First, she asserts that Wedwick, on behalf of Capitol, has admitted liability under Chapter 176D, § 3(9)(d). In Wedwick's deposition, he was asked a series of questions about the Norfield investigation, as well as questions about information regarding an attempt to bribe a witness, which surfaced in the spring of 2012. After being asked whether he ever received written confirmation from PJD regarding this alleged bribe, to which he answered he did not, Wedwick was asked the following line of questions:

> Q. So by the time you closed your file for a second time, you had hearsay information from [a PJD employee] about something McCabe said about something an unidentified employee allegedly said and that was it; correct?
>
> A. Yes.
>
> Q. And then you closed your file?
>
> A. Yes.
>
> Q. And is that a full, through [*sic*] and prompt investigation according to Capitol?
>
> A. No.
>
> Q. Does Capitol acknowledge that that failure to conduct a full, prompt and thorough investigation is a violation of Massachusetts General Laws Chapter 93A?
>
> A. Yes.

(Docket No. 91-8 at 49.) It is unclear whether the attorney's third question referred to only the unconfirmed information that surfaced regarding the bribe, or whether the question encompassed this information as well as the entire Norfield investigation. Thus, it is not clear whether Wedwick was expressing an opinion about the Norfield investigation's compliance with Chapter 93A.

Wedwick was also asked about Higgins's negligent escorting theory, and he explained that he did not know that this theory was being asserted until he received Higgins's counsel's letter dated December 27, 2013. After stating that it had not been clear to him that Higgins was asserting

two theories of liability, the attorney asked, "Is it correct that Capitol acknowledges now that it failed to comply with MGL Chapter 93A by failing to investigate that second theory?" (Docket No. 91-8 at 46-47.)  Wedwick answered, "Yes." (Docket No. 91-8 at 47.)

Higgins further argues that the Norfield investigation was not a reasonable investigation based on all available information because Wedwick instructed Norfield to terminate its investigation before it had obtained crucial information, including an employee listing and a copy of the sign-in sheet for the night of the accident.  Higgins further argues that the inadequacy of the Norfield investigation is revealed by the information that was later uncovered by Stern, who conducted a more extensive investigation after Higgins filed suit against PJD in 2013.

Stern's findings are evidenced by several memoranda that he sent to Capitol during the course of his investigation.  In a letter to Wedwick dated May 30, 2013, Stern summarized the information that he had gleaned from the police report, the accident reconstruction report, the toxicology report, witness statements, search warrants, and cell phone records.  Regarding the accident, he noted that the speed of the other vehicle involved was fifty-two miles per hour at impact; that Higgins came to a complete stop five seconds before the collision; that Higgins's blood alcohol concentration was nearly twice the legal limit; and that she had marijuana and cocaine metabolite in her system.  Regarding her consumption of alcohol at Centerfolds, Stern had not been able to identify any witnesses who said that they saw her consume alcohol.  However, he also noted minor inconsistencies in the witness's stories; that there were no surveillance cameras; and that there were no witnesses who observed Higgins while she was in the club's VIP room.  He also noted that Higgins's cellphone records revealed a text message sent a few minutes before the accident, in which she stated that she was intoxicated, as well as other calls and texts which had been redacted.

In a memorandum dated June 18, 2013, Stern included notes from an interview of McCabe and McCabe's brother.  McCabe admitted that he was aware that Higgins was under the age of twenty one but also stated that there was a bulletin board in the club that listed all of the dancers who were underage, so that the servers would not serve drinks to them.  Stern reported that alcohol was generally served by a bartender and several servers, and that although it was against club policy, Higgins could have obtained drinks from customers.  Pursuant to policy, bouncers would escort the dancers to their cars at the end of the night.  McCabe also told Stern that if a dancer had had too much to drink during her shift, the manager would call her a taxi.

Stern wrote another memorandum, dated July 29, 2013, after he had interviewed additional PJD employees.  He interviewed John Muccino, a manager at Centerfolds, who explained that it was not uncommon for dancers to drink alcohol or smoke marijuana before coming to work, and that dancers often carried water bottles while dancing, which could have been a way for Higgins to sneak alcohol into the club.  Stern interviewed Duane Prince, who was a bouncer on duty on the night of the accident and who also worked as an insurance adjuster.  Prince was adamant that Higgins did not appear to be drunk when she left and that he never would have let her leave in the condition that she alleges she was in.   He never witnessed her consuming alcohol but noted that she spent most of the night in the VIP room, where he could not see her.  Stern also interviewed Robert Carroll, the floor host on the night in question, who stated that the club had a strict policy of calling taxies for intoxicated patrons.

On August 23, 2013, Stern provided Capitol with a "Defense Counsel Initial Analysis." He summarized the above-noted information obtained from witness interviews and accident reports and provided his opinion regarding the impact of these findings on PJD's potential liability. He indicated that it was too soon to know whether Higgins was likely to prevail on her claims, but

that if she did prevail, the "likely verdict range" would be $500,000-$1,000,000, based on the information available at that time. (Docket No. 91-26 at 3.)

After attending Higgins's deposition on December 9, 2013, Stern advised Capitol to pay Higgins the full available limit on the LL Form, based on the fact that Higgins presented as a sympathetic and credible witness.  In Stern's deposition, he explained that although he never believed Capitol's liability to be "reasonably clear" as that term is used in Chapter 176D, he nevertheless advised Capitol to pay Higgins's claim because he thought that it was more probable than not that a jury would find PJD at least fifty percent at fault for Higgins's injuries.

 For the purposes of assessing whether Norfield's limited investigation violated Chapter 176D, § 3(9)(d), it can be compared to Stern's later investigation, which Higgins concedes was adequate.  If Stern's investigation revealed that liability was reasonably clear in 2013, then it would be plausible to conclude that, if Norfield had conducted a more thorough investigation in 2010-2011, liability would also have been reasonably clear in early 2012 when Capitol initially denied Higgins's claim.

Stern's investigation uncovered a multitude of facts that both strengthened and jeopardized Higgins's potential for prevailing in her case against PJD.  The accident report raised the issues of whether the collision was caused by Higgins's alcohol intoxication or by other factors, including the other driver's speed and Higgins's use of marijuana and/or cocaine.  The interviews of PJD's staff revealed that no one admitted to having seen her drink alcohol, and the bouncer reported that she did not appear to be drunk when she left.  However, the staff further explained that Higgins could have consumed alcohol in the VIP room or from a water bottle that she brought to the club. Higgins admitted to being intoxicated; her blood alcohol content was nearly twice the legal limit; and she sent a text message shortly before the accident stating that she was drunk.  These facts

suggest comparative fault, but also strengthen the argument that PJD knew or should have known that she was impaired when she left the premises.

According to Stern, Higgins was more likely than not to be found less than fifty percent at fault for her injuries and, if she prevailed, the damages assessed against PJD were likely to be $500,000-$1,000,000.  Although the exact amount of damages remained unknown, a reasonable person could find it highly probable, based on Stern's findings, that PJD's liability would reach or exceed the $300,000 policy limit.  Thus, because reasonable minds could differ on whether liability was reasonably clear in 2013 and, by implication, 2012, the issue of the Norfield investigation's inadequacy is not appropriate for summary judgment.  Neither party is entitled to summary judgment on count IV.

### Count V: Chapter 176D, § 3(9)(f)—Failing to Settle Despite Reasonably Clear Liability

Higgins alleges that Capitol violated Chapter 176D, § 3(9)(f) by willfully and knowingly failing to effectuate a prompt, fair, and equitable settlement of Higgins's claims for which liability was reasonably clear.  Under Chapter 176D, the duty to settle does not arise until liability has become reasonably clear. *Clegg v. Butler*, 676 N.E.2d 1134, 1140 (Mass. 1997) (citations omitted). As explained above, the summary judgment record contains credible evidence on both sides of the issue of whether—and when—Capitol's liability became reasonable clear.  Accordingly, neither party is entitled to summary judgment on count V.

### Count VI: Chapter 176D, § 3(9)(g)—Compelling Litigation by Offering Low Settlement

Higgins alleges that Capitol violated Chapter 176D, § 3(9)(g) by willfully and knowingly compelling Higgins and PJD to institute litigation to recover amounts due under the insurance policy by offering substantially less than the amount ultimately recovered by Higgins in her settlement with PJD.  It is undisputed that Capitol offered Higgins the limits of the LL Form in

December of 2013.  While this was substantially less than the $7,500,000 judgment that Higgins obtained in her settlement with PJD, Capitol could not have offered Higgins more than what was available under the LL Form because this was the only applicable coverage.  Capitol is entitled to judgment on count VI.

### Count VIII: Chapter 176D, § 3(9)(n)—Prompt Explanation for Denial of Claim

Higgins alleges that Capitol violated Chapter 176D, § 3(9)(n) by willfully and knowingly failing to provide a prompt and reasonable explanation for the basis of its denial of her claim based on the facts and the applicable law.  However, the undisputed facts show that Capitol met the requirements of the statute.  Regarding Higgins's initial letter of representation, Wedwick explained in his response that Capitol was denying liability because PJD had denied that it had served alcohol to Higgins.  As for the demand letter, Capitol responded with the explanation that the CGL Form did not apply to the underlying loss because of the liquor liability exclusion.  These letters were sufficient to satisfy the statutory requirements. *See Spinal Imaging, Inc.*, 2014 WL 4202498, at *17 (quoting *Pediatricians, Inc. v. Provident Life & Acc. Ins. Co.*, 965 F.2d 1164, 1172 (1st Cir. 1992)) ("where insurer's 'stated position' on coverage applies in 'straightforward manner' section 3(9)(n) 'does not pose a particularly stringent requirement'").  Accordingly, Capitol is entitled to judgment on count VIII.

### Count IX: Breach of Duty of Good Faith and Fair Dealing

Higgins alleges that Capitol breached the duty of good faith and fair dealing by engaging in the alleged unfair claim-settlement practices described above.  Higgins has not alleged that Capitol breached the insurance contract.  "Without a breach of the contract, there can be no claim for a breach of an implied covenant of good faith and fair dealing." *Dimaio Family Pizza & Luncheonette, Inc. v. Charter Oak Fire Ins. Co.*, 349 F. Supp. 2d 128, 134 n.6 (D. Mass. 2004)

(quoting *Chokel v. Genzyme Corp.,* 17 Mass. L. Rep. 83, 2003 WL 23016549, at *4 (Mass. Super. Nov. 12, 2003)); *see AccuSoft Corp. v. Palo,* 237 F.3d 31, 45 (1st Cir. 2001).  Capitol is entitled to judgment on count IX.

### 2. *Higgins's Motion to Vacate (Docket No. 93)*

This motion relates to my decision, issued nearly one year ago, on September 1, 2015, granting summary judgment in favor of Capitol on its declaratory judgment claim.  I found that the liquor liability exclusion applied to Higgins's claims and therefore barred coverage under the CGL Form.  On September 29, 2015, Higgins moved for reconsideration.  I denied the motion on October 15, 2015.  Higgins now moves to vacate the summary judgment decision on the basis of newly discovered evidence.  Specifically, Higgins contends that she has recently discovered that Capitol failed to advise PJD that it would not provide coverage for Higgins's claims under the CGL Form.

Higgins filed this motion pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, relying on the following language: "[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b).  This clause of Rule 54(b) has been construed as a recognition of the court's "inherent power" to "process litigation to a just and equitable conclusion." *Bulmer v. MidFirst Bank, FSA*, No. CIV.A. 13-30089-KPN, 2014 WL 7409590, at *1 (D. Mass. Dec. 31, 2014) (quoting *Miranda v. Deloitte LLP,* 962 F. Supp. 2d 379, 382–83 (D.P.R. 2013)); *see In re Villa Marina Yacht Harbor, Inc.,* 984 F.2d 546, 548 (1st Cir. 1993). Under this standard, the court may "afford such relief from interlocutory judgments . . . as justice

requires." *Greene v. Union Mut. Life Ins. Co. of Am.,* 764 F.2d 19, 22 (1st Cir. 1985) (citation omitted); *see United States v. Roberts*, 978 F.2d 17, 21 (1st Cir. 1992).

Capitol, on the other hand, construes this motion as a Rule 60(b)(2) motion for relief from a final judgment or order on the basis of newly discovered evidence. "Rule 60(b) relief is 'extraordinary in nature' and, thus, 'motions invoking that rule should be granted sparingly.'" *Fisher v. Kadant, Inc.*, 589 F.3d 505, 512 (1st Cir. 2009) (quoting *Karak v. Bursaw Oil Corp.,* 288 F.3d 15, 19 (1st Cir. 2002)). "A party seeking relief under Rule 60(b) must demonstrate 'at a bare minimum, that his motion is timely; that exceptional circumstances exist, favoring extraordinary relief; that if the judgment is set aside, he has the right stuff to mount a potentially meritorious claim or defense; and that no unfair prejudice will accrue to the opposing parties should the motion be granted.'" *Id.* (quoting *Karak*, 288 F.3d at 19).

Regardless of which standard applies, the substantive issue is whether Capitol's failure to provide PJD with a reservation of rights letter constitutes newly discovered evidence and, if so, whether Capitol should be estopped from denying coverage under the CGL Form on this basis. Under Massachusetts law, a liability insurer who has "led the assured to rely exclusively on its protection during the period when he might have protected himself . . . cannot, in fairness, thereafter withdraw that protection." *Specialty Nat. Ins. Co. v. OneBeacon Ins. Co.*, 486 F.3d 727, 735 (1st Cir. 2007) (quoting *Salonen v. Paanenen,* 71 N.E.2d 227, 230 (Mass. 1947)). In order for this conduct to result in estoppel or waiver, the following elements must occur: "an insurer must say or do something intended to induce conduct on the part of its insured; the insured must act or refrain from acting in reasonable reliance on the insurer's representation; and the insured must suffer some detriment as a result." *Id.* (citing *Safety Ins. Co. v. Day,* 836 N.E.2d 339, 346 (Mass. App. Ct. 2005)).

Higgins alleges that Capitol should have given PJD a reservation of rights letter advising PJD that it was planning to deny coverage under the CGL Form and that, because it did not give PJD this letter, it should now be estopped from denying coverage under that policy.   Higgins alleges that the newly discovered information—Capitol's failure to give PJD a reservation of rights letter—was "concealed or intentionally withheld by Capitol" when the original summary judgment decision occurred nearly one year ago. (Docket No. 93 at 1, 3).

According to Higgins, her claims against PJD were twofold—negligent service of alcohol and negligent escorting—incorporating both the LL Form and the CGL Form, respectively. Higgins asserts that Capitol was put on notice of both of these claims as early as 2010, when PJD first notified Capitol of the accident.   However, there is no indication that Capitol ever considered Higgins's claim to be anything but a liquor liability claim implicating the LL Form.   The issue of whether the CGL Form might apply did not arise until Higgins's counsel raised the issue in his letter dated December 27, 2013, in which he rejected Capitol's offer to pay out the full remaining limit of the LL Form and explained, for the first time, that Higgins was seeking coverage under the CGL Form and the LL Form.   There is no indication that PJD was led to believe, when Capitol assumed its defense and appointed Stern as its attorney, that it was doing so under the CGL Form. Thus, PJD did not detrimentally rely on Capitol's defense under the CGL Form because capitol never provided a defense under the CGL form. This is not the bait and switch scenario to which estoppel is meant to apply—when an insurance company leads its insured to believe that it will provide coverage for a claim, assumes responsibility for the insured's defense of that claim, and then decides later on to dispute coverage. *See, e.g., Safety Ins. Co. v. Day*, 836 N.E.2d 339 (Mass. App. Ct. 2005).

More importantly, Higgins has not presented a convincing argument as to why she could not have previously discovered Capitol's alleged failure to reserve its rights under the CGL Form. The parties engaged in discovery prior to Capitol's summary judgment motion, and Capitol disclosed non-privileged materials relating to its coverage of PJD.   There is no indication that Higgins requested information regarding Capitol's alleged failure to reserve its rights.   Then, on July 2, 2015, pursuant to the settlement agreement, PJD assigned Higgins its rights against Capitol. At this point in time, Higgins stepped into PJD's shoes and, therefore, should have had access to PJD's files regarding its correspondence with Capitol.   Indeed, the nature of Higgins's argument depends on what PJD knew with regard to Capitol's coverage of Higgins's claim, not what Capitol believed to be true.   Higgins has not provided any persuasive explanations for her failure to raise the reservation-of-rights issue at summary judgment, on her motion for reconsideration, or during the eight months that passed between that motion and her instant motion to vacate.   For these reasons, Higgins's motion to vacate will be denied.

## <u>Conclusion</u>

For the reasons set forth above, Plaintiff's motion to dismiss (Docket No. 78) is ***denied*** as moot and Defendant's motion to strike (Docket No. 87) is ***denied*** as moot.   Plaintiff's motion for summary judgment (Docket No. 88) is ***denied*** as to counts III, IV, and V, and ***granted*** as to counts I, II, VI, VII, VIII, and IX.   Defendant's cross-motion for summary judgment (Docket No. 91) is ***denied***, and Plaintiff's motion to strike (Docket No. 109) is ***denied***.   Defendant's motion to vacate (Docket No. 93) is ***denied***.   Judgment shall enter for Plaintiff on counts I, II, VI, VII, VIII, and IX of Defendant's counterclaims.

**SO ORDERED.**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**