UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Capitol Specialty Insurance Corporation | ) |
|     Plaintiff | ) |
|         v. | ) Civil Action No: 14-cv 40086 TSH |
| Kailee Higgins | ) |
|     Defendant | ) |

HILLMAN, D.J.

## FINDINGS OF FACTS AND RULINGS OF LAW

### March 25, 2019

### Introduction

In the early morning hours of November 28, 2010, Kailee Higgins was seriously injured in an automobile accident after leaving her employ as an exotic dancer at a nightclub in Worcester called Centerfolds II, owned by P.J.D. Entertainment of Worcester, Inc. ("P.J.D."). P.J.D. was insured by Capitol Specialty Insurance Corporation ("Capitol"). Ms. Higgins alleges that she was served alcohol while underage that made her intoxicated and that she was allowed to drive despite being obviously intoxicated. Ms. Higgins claims that Capitol violated M.G.L. C. 176D by "failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies" (Count III); that Capitol violated M.G.L. C. 176D by "refusing to pay her claim against P.J.D. without conducting a reasonable investigation based upon all

available information" (Count IV); and that Capitol violated the M.G.L. C. 176D by "failing to effectuate prompt, fair, and equitable settlements of her claim against P.J.D. in which liability has become reasonable clear" (Count V).[1] After careful consideration, review of the evidence in this case and the proposed findings and rulings from counsel I find for the Defendant, Plaintiff in Counterclaim, Ms. Higgins in the amount of $5,400,000.00.

## Findings of Fact

On November 27, 2010 the Plaintiff Kailee Higgins was 20 years old. She lived by herself, owned her own automobile, and was by all accounts an attractive, intelligent, young woman. She began working at P.J.D. approximately three months before the accident. When she was hired, P.J.D. required her to provide a driver's license which demonstrated that she was not old enough to drink. As an exotic dancer at P.J.D. she was not paid an hourly rate or salary but relied on tips from customers for her income. As part of her employment she had to pay the club a fee to dance and, in order to stay on their good side, tip the DJ, bouncers, and waitstaff at the end of her shift.

Ms. Higgins was advised upon hiring, and it was her experience at other clubs where she worked, that she was to pressure customers to buy drinks. This resulted in customers buying her drinks which required Ms. Higgins to drink alcohol, even though she was underage. During her time at P.J.D. she was never refused a drink, or asked for proof of age by the waitstaff or bartenders and Ms. Higgins regularly drank to excess while performing at P.J.D. P.J.D. also maintained a "Champagne Room" which enabled the dancers to give private dances to a

---

[1] Capitol filed a complaint seeking a declaratory judgment pursuant to Fed. R. Civ. P. 57 & 28 U.S.C. 2201 that Capitol was not obligated to defend or indemnify P.J.D. under the Commercial General Liability part of their insurance package.

2

customer. The dancer would make significantly more money in tips in the Champagne Room than dancing on the stage.

"Shot Girls" were present on the floor in order to enhance the opportunities for customers to purchase alcohol for themselves and the dancers. It was common, and expected, for P.J.D. to serve alcohol to the dancers purchased by customers, which occurred regularly and without any restrictions by management. As one of the "perks" of the job, the dancers were given a free shift drink before beginning their shift. Ms. Higgins was in the habit of ordering Patron Tequila as her shift drink, and was often observed by her friend Deanna Macleod, who was also a dancer, drinking to excess while at work.

P.J.D. had a policy of having a bouncer escort every dancer to their car at the end of their shift, or to call a cab to take a dancer (or customer) home who was intoxicated. As part of this policy P.J.D. employed Duane Prince as a bouncer who was in charge of the safety of the dancers.

On November 27, 2010 Ms. Higgins worked a shift at P.J.D. Before starting her shift she had three shots of Patron Tequila. During her shift she consumed at least 12 more shots of Tequila in the club and the Champagne Room and she became heavily intoxicated. At no time did personnel from P.J.D. try to prevent her from drinking. Ms. Macleod, who was also working that evening, had seen Ms. Higgins intoxicated before and knew that she was intoxicated because she was unsteady on her feet and her voice was unusually loud. Ms. Macleod's shift ended at approximately 11:30 p.m. and, as was the custom, she was escorted to her car by Mr. Prince. Ms. Macleod believed that she was visibly intoxicated and was stumbling as she walked, but was allowed to drive away. Ms. Higgins' shift ended around 2:00 a.m. (on November 28) and she too was escorted to her car by Mr. Prince. Mr. Prince had to take her keys from her in order to

open the car door and physically sit her into the driver's seat. He then gave the keys back to her and watched as she started her car. Before Ms. Higgins drove away she texted a friend "he he maaad drunk lol" (tt2-116, 16-20). Ms. Higgins was allowed to drive away in a heavily intoxicated condition.

Within minutes of leaving P.J.D., Ms. Higgins was involved in a two-car collision with an off-duty Worcester Police Officer. She suffered serious and permanent injuries including traumatic brain injury, multiple facial bone fractures, including a dislocation fracture of her left orbit socket, and a shattered nose. Her teeth were knocked out, a lip was ripped open, she sustained a large laceration on the left side of her face, and her left arm was permanently damaged. She has had over a dozen surgeries to rebuild and reconstruct her face. The surgical repair of her left eyeball has left her with a permanently damaged, mis-matched left eye. After leaving the hospital she went to the Spaulding Rehabilitation Center for several weeks. Her medical expenses and lost wages are in excess $375,000.00.

The owner of P.J.D. is Richard McCabe. Immediately after learning of the accident, Mr. McCabe spoke with Duane Prince. Mr. Prince denied to Mr. McCabe that Ms. Higgins was intoxicated when he walked her to her car. Mr. McCabe duly reported the accident to his insurance broker, Donald Bunker, who put Capitol on notice of a potential claim via an ACORD, general liability notice of an occurrence. That ACORD advised Capitol that Higgins, had sustained serious bodily injury in a car accident shortly after leaving the workplace and that she was underage.

On December 15, 2010, Capitol referred the claim to Norfield & Associates, an adjustment agency with instructions to do a "limited investigation" of the accident. The "limited investigation" is significant because the policy issued to P.J.D. by Capitol was an eroding limits

4

policy which means that once a claim is made the cost of investigation and defense are deducted from the policy limits. Until a claim is made, the costs are born by Capitol. Because the ACORD was not a claim, the expense of the investigation fell on Capitol.

Not surprisingly, the P.J.D. employees interviewed maintained that Ms. Higgins was <u>not</u> drinking at the club, or if she was, she was drinking alcohol she brought with her. This is "not surprising" because the accident had generated a great deal of media publicity which included a criminal investigation and an investigation by the Alcohol Beverage Board.

Norfield began its investigation on December 16, 2010 and on December 28th, sent a preliminary report of its investigation to Capitol. That preliminary investigation relied solely on statements from Richard McCabe, his brother Robert, who was the General Manager at PJD, and one bartender, all of whom denied that Ms. Higgins was drinking at the club or that she appeared intoxicated when she drove away. By December 28th Norfield had not secured an employee list for the evening of the incident, or a copy of the sign-in sheet identifying the dancers who were present that evening. Nor was there any indication that Norfield (or Capitol) had any idea of P.J.D.'s policy of having the dancers encourage patrons to drink and to buy them drinks or had done anything else to verify the self-serving statements of the McCabes or the bartender.

In the preliminary report that Norfield sent to Capitol, they advised that they were about to schedule a meeting with Centerfolds to obtain further liability information and to obtain a list of the employees who were present that evening. However, before that could happen Capitol, through its claim manager, Michael Wedwick terminated Norfield's investigation. Significantly, that was the extent of the investigation of the claim prior to the filing of the lawsuit in May of 2013, almost three years later.

On February 3, 2012, Attorney John Donohue sent a letter of representation on behalf of Ms. Higgins asserting claims on her behalf against P.J.D. In that letter Attorney Donohue alleged that P.J.D. served Ms. Higgins while she was underage to the point of intoxication, and that despite accompanying her to her motor vehicle, allowed her to leave the premises while obviously intoxicated. On February 13, 2012, (the same day that Capitol received Donohue's letter or representation) Capitol responded in writing denying liability, despite the fact that virtually no investigation had taken place. They again closed the Higgins file without further investigation. Michael Wedwick testified that it was Attorney Donohue's duty "as an advocate for his client" to supply him with facts to enable him to evaluate the claim. The file remained closed until May 24, 2013 when Ms. Higgins filed a lawsuit for personal injuries against P.J.D. in the Worcester Superior Court.

Capitol retained Attorney Jeffrey Stern to defend P.J.D. on behalf of Capitol. That lawsuit alleged that P.J.D. had encouraged Ms. Higgins to drink to the point of intoxication knowing she was under the legal age limit, and that "Plaintiff was obviously intoxicated when an employee of the Defendant escorted the Plaintiff from the building to her vehicle in the parking lot." Capitol was also aware that Ms. Higgins had sustained medical bills in excess of $279,000.00. On May 30, 2014 Capitol received its first written report from Attorney Stern in which he advised that Ms. Higgins had a .155 blood alcohol level which was twice the legal limit, and that the Worcester Police officer who was detailed to the club that evening stated that Ms. Higgins may have consumed alcohol in the Champagne Room. Attorney Stern also advised Capitol that a bouncer had escorted Ms. Higgins to her vehicle at the end of the shift and that before Ms. Higgins left the premises she had texted "he he maaaad drunk, lol" to a friend. Attorney Stern

concluded that there were "serious concerns about liability" (TT3-92,6-14). Significantly, Attorney Stern was able to obtain this information within one week of suit being filed.

To further complicate matters for Capitol, in June 2013 Capitol was advised by Attorney Stern that a bartender at P.J.D. who had previously given an opinion that Ms. Higgins had not been served alcohol had deceased.[2] On June 19, 2013, Attorney Stern advised Capitol that after meeting with the owners of the club that "there is a real possibility that patrons bought drinks for (Ms. Higgins) and the question to be whether we should have monitored that." (SF 35). Attorney Stern also advised Capitol that P.J.D. knew Ms. Higgins was underage and that it was likely that Ms. Higgins had obtained drinks from patrons who bought them for her. He further advised that the sign-in sheet, which identified which dancers were on duty the night of the accident was no longer available.

On July 29, 2013 Attorney Stern provided a written report to Capitol summarizing meetings with some of the employees of P.J.D. In that report he opines that "it seems pretty likely that she did some drinking at the club" (SF 47; ex 23). In that memo he also advised that the driver of the other car with which Ms. Higgins collided, was an off-duty Worcester Police officer who "got a total pass" from the Worcester Police Department (SF 48; ex. 23). He also advised that he learned that it was common for patrons to buy drinks for the dancers and that it was common for dancers to drink "or smoke weed before they come to the club in part because they don't want to pay our prices" (SF 50; ex 23). That it was common and encouraged for patrons to buy drinks for dancers was an obvious fact, and easily discovered. This fact should have been known in

---

[2] While that bartender was one of the few employees interviewed by Norfield, her statement should have been suspect from the get go. First, the bartender (and other club employees) were not going to admit that they served Ms. Higgins knowing that she was underage, or that they allowed an obviously intoxicated person to drive. Second, even a cursory investigation would have revealed that the "Shot Girls" were serving alcohol that night and the Champagne Room was serving alcohol. Third, the accident generated a good deal of publicity because Ms. Higgins collided with an off-duty Worcester Police Officer and was being investigated by the Alcoholic Beverage Commission, and State Police.

7

December of 2010 because it is a common industry practice and should have been sufficient for Capitol to realize that P.J.D.'s practices were conducive and encouraging to over serving the dancers.

On August 23, 2013 Attorney Stern sent a Capitol a Defense Counsel Initial Analysis Report (SF 63; ex 24). In that report Attorney Stern advised Capitol of Ms. Higgins' claims that "she was actually stumbling on her way to her vehicle to which she was escorted by a P.J.D. employee," (SF 65; ex 24) and that her blood alcohol was in excess of .155 at the time of the accident, that it unlikely that she consumed any alcohol in the vehicle after leaving the club, and that "it seems likely that she did in fact consume alcohol during the time she was working" at P.J.D. (SF 68; ex 24). In that report Attorney Stern also advised that Ms. Higgins medical were going to be in excess of $293,000.00 and her lost wages were claimed to be $58,000.00. He also opined that "there is clearly a seven-figure potential" on Ms. Higgin's claim, and the full value could be a high as two to three million dollars. Finally, Stern advised Capitol that the likely verdict range in this case was "$500,000-$1,000,000 but certainly could be higher" (SF 79; ex 24).

After receiving Attorney Stern's Defense Counsel Initial Analysis Report and speaking with him, Mr. Wedwick understood that Attorney Stern was advising him "that there's zero chance of a defense verdict" in P.J.D.'s favor (TT 7-168, 3 to 7-169). On December 19, 2013 Wedwick sent an email to Attorney Donohue offering the policy limits minus the costs of defense. For some reason that email was not received by Donohue and Capitol chose not to recommunicate the settlement offer or to affirm that it had been received. On January 7, 2014 Mr. Wedwick learned for the first time that the escorting theory asserted by Ms. Higgins was a separate and distinct legal theory from the negligent service theory. He wrote to his supervisor Mary Hafer, "I

8

am reluctant to put any GL money on this, I think that we file the DJ, Plaintiff's counsel may back-off and take the $300 k to wrap this up" (Ex 57; TT 5-17, 12-14). On September 16, 2015 Capitol tendered a check to the Plaintiff for the remainder of its eroded insurance policy totaling $267,170.88.

Richard McCabe, the owner of P.J.D. engaged in settlement negotiations with Ms. Higgins. He entered into a separate agreement for judgment with Ms. Higgins because of his concern of the possibility of personal judgment against him in excess of the insurance coverage. That agreement for judgment executed between P.J.D. and Ms. Higgins was in the amount of 7.5 million dollars and required P.J.D. to pay $50,000 to Ms. Higgins. McCabe has assigned his rights against Capitol to Higgins.

## Conclusions of Law

Higgins alleges that Capitol willfully, and knowingly in bad faith violated the Massachusetts Consumer Protection Act (M.G.L. C 93A) by its claims handling conduct under the Massachusetts Common Law and for its violations of three provisions of M.G.L. C 176D §3(9) that proscribe insurance claims investigation and settlement.[3] Specifically, Higgins argues that Capitol violated Massachusetts General Laws Chapter 176D §3(9)(c) which requires insurers "to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies." (Count III). They further allege that Capitol also violated General Laws Chapter 176D §3(9)(d) which requires insurers to conduct "a reasonable investigation based upon all available information" before denying an insured claim (Count IV). Thirdly, the Plaintiffs allege that Capitol violated both Chapter 176D §3(9)(c) and (d) when they failed to make a prompt and reasonable investigation based upon all available information. Finally,

---

[3] Since there is no individual cause of Action enumerated in Chapter 176D, any claims must be asserted under C 93A §9(1) for violation of Chapter 176D by insurance companies.

9

Higgins alleges that Capitol violated General Laws Chapter 176D §3(9)(f) by failing "to effectuate prompt, fair, and equitable settlement claims in which liability has become reasonably clear" (Count V).

*General Laws Chapter 176D §3(9)(c)*

Higgins alleges that Capitol's failure to train its claims personnel on Massachusetts tort law, Massachusetts bad faith law, and the requirements of General Law C 176D and C 93A violates the statute. They point to the trial testimony of Mr. Wedwick, who admitted that he had no training on substantive Massachusetts Court Law including common law liquor liability. Specifically, the Plaintiffs point to Capitol's failure to train Mr. Wedwick on critical Massachusetts legal definitional terms, such as reasonably clear liability and the legal elements of the escorting theory of liability. They claim that Capitol's failure to recognize that liability was reasonably clear in the Spring of 2011, on February 13, 2012, May 30, 2013, June 19, 2013, July 29, 2013, August 23, 2013, and September 16, 2013, was due to Capitol's failure to train its claims personnel on Massachusetts Law and its failure to adopt and implement reasonable standards for the prompt investigation of claims in compliance with M.G.L. C. 176D §3(9)(c) and C. 93A.

Capitol argues that there is no legal authority to support the Plaintiff's claim that C. 176D §3 (9)(c) requires insurance companies to provide training to claims adjusters on "the specific substances of tort law" that might be asserted against policy holders and covered under insurance policies issued in Massachusetts. Contrary to Higgins arguments, I find that Wedwick and Capitol were cognizant of basic claims handling procedures, they simply chose to ignore those claim handling practices, and not to address Ms. Higgins claim until they were forced to respond to her lawsuit.

*M.G.L. Ch 176D §3(9)(d)*

M.G.L. Ch 176D §3(9)(d) defines an "unfair claims settlement practice" to include "refusing to pay claims without conducting a reasonable investigation based upon all available information." In other words, insurers must investigate claims thoroughly before making a determination of an insurer's liability. *Clegg v. Butler,* 424 Mass. 413, 421 (1997), where an insurer fails to interview parties and persons with knowledge of the facts and otherwise performs an inadequate investigation, the insurer violates General Laws Ch 176D §3(9)(c) and 3(9)(d), *Sterling v. Commerce Insurance Company* 2009 WL 323455, @ *8-9 (Mass. Sup. Ct. February 2, 2009).

A summary of the claims timeline is helpful. Following the accident on November 28, 2010 the owner of P.J.D., Richard McCabe, reported the accident to his insurance broker, Daniel Bunker. Shortly thereafter, Mr. Bunker prepared an ACORD form, which was received by Capitol on December 15th. Capitol retained Norfield & Associates, to investigate the accident. In a cover letter attached to the ACORD, Mr. Bunker advised Capitol that Ms. Higgins was a performer at P.J.D., that she suffered severe bodily injury in a car accident while on her way home from P.J.D. at approximately 2:00 – 2:30 a.m., that Ms. Higgins was underage and was not allowed to be served alcohol beverages by P.J.D. and that the Alcoholic Beverage Board of Massachusetts and State Police were investigating the accident and taking statements from employees of P.J.D. who were working on the evening of the accident (SF ¶ 13). This information alone was more than sufficient to put Capitol on notice that this was not an ordinary claim.

On December 28, 2010 Northfield & Associates sent their preliminary report to Capitol. In that report Norfield advised Capitol that they were able to interview Richard McCabe, the owner,

11

Robert McCabe, his brother and manager of P.J.D's and Ms. Lemay, a bartender who was on duty that evening. Norfield also reported that they were in the process of securing an employee roster for that evening and other pertinent documents. Norfield advised Capitol "we will develop a list of potential witnesses and related parties along with their contact information" (SF 18). Despite knowing virtually nothing about the events of the evening other than self-serving statements from select employees, Capitol elected to end the investigation and close its claims file. What is even more troublesome is that the employees who were interviewed had vested interests in not revealing their conduct, a fact that was obvious to anyone who understood their potential liability for serving an underage person who got into a serious car accident after leaving the club. Further, even a cursory understanding of P.J.D.'s business model would have revealed their policy of encouraging patrons to buy drinks for the dancers.

This file would remain closed until Capitol received a letter of representation from Ms. Higgin's Attorney on February 13, 2012. Capitol acknowledged the receipt of the letter and after still not conducting a further investigation denied liability and again closed its file. This was done, despite the fact that Attorney Donohue specifically alleged that Ms. Higgins was allowed to consume alcohol while under age to the point of intoxication and that she was allowed to drive while obviously intoxicated. The file remained closed for over a year until May 24, 2013 when Ms. Higgins filed suit against Capitol. Thereafter Ms. Higgins file was referred to Attorney Stern to defend. Attorney Stern made periodic reports to Capitol all of which reflected that Capitol's investigation was non-existent and that P.J.D. was liable. Significantly, each of Attorney Stern's reports to Capitol served to further establish P.J.D.'s liability.

Had Capitol used minimal effort and expense and allowed Norfield & Associates to track down and interview witnesses, and collect the relevant facts immediately following the accident

this case would have followed a far different path. It would have revealed at a minimum the names and addresses of the employees, including dancers, working at the club on the evening of the accident. They would have learned that Ms. Higgins, and every other dancer that worked at P.J.D.'s, were required to encourage patrons to buy them drinks. They would have also learned that Ms. Lemay, the bartender who claimed not to have served alcohol to Ms. Higgins, was an alcoholic who was terminated for drinking on the job. They would have learned that she had misrepresented to Norfield that she was the only person serving drinks when, in fact, there were several "Shot Girls" on the floor and alcohol also being served in the Champagne Room. Had the investigation been completed by Norfield, all of these facts would have shown without question that the two theories of recovery relied upon by Ms. Higgins would have been eminently provable, and that liability was reasonably clear.

*G.L. C176D §3(9)(f)*

Higgins finally alleges that Capitol has failed to effectuate settlement after liability became reasonably clear in violation of G.L. C 176D §3(9)(f). For an insurer to confront liability under sub-section (f) for failure to make a reasonably prompt offer of settlement potential liability on the underlying claim must first be reasonably clear, *Lazaris v. Metropolitan Prop & Cas Ins Co.* 428 Mass. 502, 503 (1998). It is settled that an insurer that fails to offer to settle a claim for policy limits after determining that the insured is liable in excess of policy limits acts in bad faith *Demarzo v. American Mut. Ins. Co*. 389 Mass 85, 97 (1983). The three primary components to a viable claim under §3(9)(f) are:

(1) Whether liability became at some point reasonably clear; and

(2) Whether the insurer thereafter failed to make a reasonably prompt offer of settlement; and

13

(3) If the insurer made an offer whether the offer was reasonable *Bobick v. United States Fidelity & Guaranty Ins. Co*. 57 Mass. App. Ct. 1, 3-4 (2003).

It is important to note that whether an insured's liability is reasonably clear is based upon an objective assessment of the facts known or available at the time. Consequently, the test for reasonably clear liability under C. 176D must be applied not to the information that a defendant insurer actually obtained and possessed, but to the information that a reasonable insurer conducting an investigation of all available information would have obtained and possessed. *McLaughlin v. American States Ins. Co.* 90 Mass. App. Ct. 22, 55 (2016).

Higgins points to at least 10 dates at which Capitol could have concluded that liability was reasonably clear: In early Spring of 2011, after Capitol had ceased to investigate the claim; on February 13, 2012, after receipt of Attorney Donohue's letter of representation on behalf of Ms Higgins outlining various theories of liability; on May 30, 2013, after Capitol received their first written report from Attorney Stern in defense of the lawsuit that was filed by Ms. Higgins; on June 19, 2013 after Stern sent a report to Capitol after meeting with the McCabe brothers; on July 29, 2013 after Stern again reported on the factual underpinnings for Ms. Higgins claim; on August 23, 2013 when Attorney Stern reported that liability was probable in his Defense Analysis Report; on February 10, 2014, when Capitol responded to Ms. Higgins demand letter of December 27, 2013.

Capitol argues that P.J.D.'s liability was never reasonably clear because Ms. Higgins was contributorily negligent. The assertion that the club could mitigate its liability for serving an underaged Higgins it is without merit. M.G.L. C.138, § 34 forbids anyone, including licensed establishments, from serving alcohol to anyone under 21. M.G.L. C.138, § 34. This duty to refrain from serving alcohol to minors is triggered when the establishment knew or reasonably

should have known that it was furnishing alcohol to a person under 21. *See Nunez v. Carrabba's Italian Grill,* 448 Mass. 170, 178 (2007). "The club's knowledge is measured by the cumulative knowledge of its employees." *Tobin v. Norwood Country Club, Inc.,* 661 N.E.2d 627, 629-30 (1996). A plaintiff must present evidence that those establishments served her alcoholic beverages knowing, or having reason to know, that she was under 21, and was injured as a consequence. *See id.* Here P.J.D. took great pains to obtain and copy Ms. Higgins drivers license when she began her employment. Though an establishment is not strictly liable for serving a minor and can introduce a mistake of fact defense, in Ms. Higgins' case, the club was aware and had documentation on file stating she was only 20 years old and still provided her alcohol on a regular basis. *Michnik-Zilberman v. Gordon's Liquor, Inc.*, 390 Mass. 6, 11 (1983).

## **Damages**

I find that Capitol violated General Laws C. 176 D § 3(9)(d) and General Laws C. 93A § 9, by failing to adopt and follow reasonable standards for the prompt investigation of Ms. Higgin's claim which resulted in serious and significant adverse consequences to her. I further find that Capitol violated General Laws C. 176 D § 3(9)(f) and General Laws C. 93A § 9 by failing to effectuate prompt, fair and equitable settlement of Ms. Higgin's claims when liability became reasonably clear, again resulting in serious, and significant and adverse consequences to Ms. Higgins. These adverse consequences included, depriving Ms. Higgins of the opportunity to engage in a timely settlement process, delayed for a period of years her obtaining of the P.J.D. policy proceeds, needlessly forced her to litigate her tort claims against P.J.D., caused her to be unable to pay her significant unpaid medical expenses for a period of years, caused her physical and mental anguish and emotional distress, in addition to the severe physical, mental, and emotional injuries that she sustained in the motor vehicle accident, by diminishing by almost

$33,000.00 the insurance coverage that was ultimately left for her after the policy limits was unnecessarily eroded by litigation costs incurred once she made a claim.

Higgins also entered into a settlement with P.J.D. and took an assignment of P.J.D.'s rights against Capitol. Higgins claims the $7.5 million dollar settlement was an arms length transaction and binding on the Court. I disagree and choose to enter a judgment against Capitol without regard to the P.J.D. settlement.

For the reasons set forth above, I find for Ms. Higgins against Capitol and assess damages in the amount of $1.8 million dollars.

I further find that Capitol's violations of M.G.L. C176D § 3(9)(d) & (f) were willful, knowing, and in bad faith. That Capitol twice closed its file without doing even a cursory investigation at best demonstrates willful blindness, and worse a deliberate and intentional act to avoid their statutory responsibilities. Further, once Attorney Stern began handling the claim, P.J.D.'s liability became reasonably clear within weeks. Despite Attorney Stern's blunt assessment that he couldn't win the case at trial, Capitol continued to prevaricate and string the Plaintiff along. Quite simply, Capitol's conduct in handling this claim was exactly the type of conduct that C176D & C.93A proscribes. Accordingly, I treble the $1.8 million dollars in damages and award damages to Ms. Higgins in the amount of $5.4 million dollars, together with pre-judgment interest and costs.

*/s/Timothy S. Hillman*
TIMOTHY S. HILLMAN
DISTRICT JUDGE